## United States Fidelity & Guaranty Company v. Citizens National Bank of Monticello, Kentucky.

(Decided February 29, 1912.)

### Appeal from Wayne Circuit Court.

1. Banks and Banking—Embezzlement by Cashier—Contract of Indemity.—The facts in this case show that the parties to this contract of indemnity intended that the bond of the cashier and four continuation certificates should constitute one continuous contract, and appellant obligated itself in the sum of $15,000.00, to pay the bank for any embezzlement or larceny committed by the cashier that might be fixed by any renewal of the contract. The four letters in the case show that the original bond and the four renewal certificates were to constitute one contract.

2. Continuation Certificates—Annual Premium.—The fact that appellant issued to appellee four continuation certificates each covering a period of one year beginning, March 15, 1905, is also evidence of the fact that the parties intended that the original writings and certificate should constitute one contract, covering a period of five years. The bond was kept alone in a manner similar to an insurance policy, that is by the payment of annual premiums.

3. Bank Officials—Expert Examination.—At the time appellant issued this insurance it knew that the bank was what is called a "county bank," and that its officers were men who probably could not give the accounts an expert examination and it is pre-

sumed that it understood the answer to the question to mean that it would give the accounts the best examination they could.

4. Duty of Officials—Intent in Making Overdrafts.—It was the duty of the bank officials to give notice to appellant of any act of McConnaghy that indicated fraud or dishonesty on his part, that was likely to involve a loss upon it, and as he concealed his fraudulent acts by forging notes and crediting his overdrafts by the apparent proceeds of the notes, it is now clear that he had an evil intent when he drew the overdrafts.

BRUCE & BULLITT, WM. MARSHALL BULLITT, KEITH L. BULLITT and CLARENCE C. SMITH for appellant.

J. P. HARRISON, P. R. HARRISON and O. H. WADDLE & SON for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

Prior to 1904, appellee, Citizens National Bank of Monticello, Kentucky, organized as a national bank with $25,000 capital stock, which was afterwards increased to $50,000. It had in its employ as cashier, Charles Mc-Connaghy, against whose dishonesty the bank was insured during the first years of his service, by some company other than appellant. On March 15, 1904, appellant executed a bond insuring the bank against loss to the extent of $15,000, by reason of fraud or deceit on the part of its cashier, McConnaghy, which amounted to embezzlement or larceny. By the express terms of this bond it expired on March 15, 1905, and annually thereafter continuation certificates were issued to the bank, which continued the bond. The number of the bond was 292114. McConnaghy remained the cashier of the bank from the date of the execution of the bond to October 31, 1908, at which time Johnson, a national bank examiner, found a shortage in his accounts with the bank. The cashier's first criminal acts occurred the last of 1906 or the first of 1907, and continued until the date of discovery. His shortage in the aggregate amounted to about $34,000, but it is not shown for what amount he defaulted in any one year. Appellant contends that the bond executed March 15, 1904, and each continuation certificate executed annually thereafter, to March 15, 1908, constituted separate and independent contracts, and that therefore, the bank must allege and prove the loss occurring under each of them, and that the rights of the parties should be determined as

to rules of notice and time of action in accordance with this theory. If this contention is correct, then appellee could not recover for any embezzlement or larceny committed by the cashier, except those committed during the life of the last contract, as the time given, to wit, six months, for the discovery of the fraud had expired on all the contracts but the last. Appellee, on the other hand, contends that the original bond and the four certificates constitute one continuous contract, and the lower court so held and rendered a judgment against appellant for $15,000 only, as that was the full amount of the indemnity under the contract. Appellant refers to the case of DeJernette v. Fidelity & Casualty Co., 98 Ky., 558. This court did hold that the bond and renewals in that case were separate contracts, but upon a close examination of the facts of that case and those in the case at bar, a difference will be found. It is reasonable to presume that because of the construction placed upon the contract in the DeJernette case, that portion of the public wanting indemnity insurance, required a different contract as it seldom occurs that embezzlement or larceny is detected within three, six or twelve months after committed, especially if the employee has been in the service of his employer for some time and is trusted by him and is shrewd. Therefore, in order to obtain business, the indemnity and guaranty companies gave them a contract which would protect them.

As stated, the bond in question was issued March 15, 1904, and the bank paid the premium, $45, at that time. Appellant agreed in the bond to indemnify the bank in the sum of $15,000 against any loss it might sustain at the hands of its cashier by any acts of his which amounted to embezzlement or larceny, for the term of twelve months, provided his wrong-doing was discovered within six months from the time the contract expired. If the bond and four renewal certificates contained only these stipulations, then appellant's contention is correct, and the case would be governed by the DeJernette case, but we are of the opinion that the facts of this case show that the parties intended that the bond and four continuation certificates should constitute one continuous contract. In the original bond this language is used:

"The company shall, during the term above men-

tioned or any subsequent renewal of such term,    *    *    *
make good and reimburse to the said employer, said
pecuniary loss as may be sustained by the employer
by reason of the fraud or dishonesty of the said em-
ployee in connection with the duties of his office or po-
sition, amounting to embezzlement or larceny, and which
shall have been committed during the continuance of
said term or any renewal thereof, and discovered during
said continuance or any renewal thereof, or within six
months thereafter."

Similar language is used throughout the bond, and
we are unable to understand why. If the bond was in-
tended by the parties to have no connection with any
other, why was this language used? For what was it
inserted? It appears from this language that appel-
lant was obligating itself in the sum of $15,000 to pay
the bank for any embezzlement or larceny committed
by its cashier, not only from March 15, 1904, to March
15, 1905, but to any period that might be fixed by any
renewal of the contract. There are also four letters in
the record which, to our minds, show that the parties
intended that the original bond and the four renewal
certificates were to constitute one contract. These
letters were written by the president of appellant on
the first day of each February after the execution of the
original contract, and were directed to McConnaghy,
the cashier, and were for the purpose of reminding him
as to when the premium on the indemnity insurance
would be due. As all the latters are, in substance, the
same, we will copy the last, omitting the formal parts:

"Baltimore, February 1, 1908.

"We hereby notify you that bond No. 292114, for
$15,000 issued by this company on your behalf to Citi-
zens National Bank, Monticello, Ky., will expire on the
15th day of March next. Issued the 15th day of March,
1904.

"The premium, $45, should be paid on or before the
date of expiration, and a continuation certificate se-
cured, otherwise the bond will lapse.

"Kindly have the certificate below filled in and signed
by your employer, and forward with remittance for
premium to Mr. T. S. Dugan, Louisville, Ky., when the
renewal receipt will be sent you."

It will be observed in all these letters that the presi-
dent refers to the bond or original paper as bond No.

292114 and says that it will expire unless the premium, $45, is paid on or before the 15th of the following March. If the original bond and each certificate constituted separate contracts, why did he not refer to the fact that the bond in force at the time he wrote would expire on the 15th day of the following March, and ask for the privilege of issuing a new bond? It will also be observed that the president speaks of the premium and says that it should be paid on or before the expiration of the bond. If the writings were separate contracts and the first expired on March 15, 1905, and one on the 15th of each March thereafter, he should have referred to the expiration of the contract made for that year, but instead of doing this, he referred to bond No. 292114 of 1904, in the letter copied and all the others, and also says that upon the receipt of $45 a "continuation certificate will be sent and that if the premium is not sent that the "bond will lapse." It appears that the only bond ever issued by appellant was the one of March 15, 1904, and it is evident to this bond that the letters refer when they say that the bond will lapse unless the premium is paid by a certain time. In the letter dated February 1, 1906, the president made a slight change of language in the second paragraph. The language used in the second paragraph of that letter is as follows:

"The premium, $45, should be paid on or before the date of expiration, and a continuation certificate or a new bond secured, otherwise the bond will lapse."

Thus we see the words "new bond" were inserted in this letter and indicate that a new contract was in the mind of the president; but the premium was paid and appellant sent the bank a continuation certificate, and no new bond was issued. The fact that appellant issued to appellee four continuation certificates, each covering a period of one year, beginning on March 15, 1905, is also evidence of the fact that the parties intended that the original writing and the certificates should constitute one contract covering a period of five years. We will copy one of these certificates only, as they are in substance the same except as to date. It is as follows: (Omitting the date and signature of the official.)

"In consideration of the sum of forty-five dollars, The United States Fidelity and Guaranty Company hereby continues in force bond No. 292114 in the sum of fifteen thousand dollars, on behalf of Chas. McCon-

naghy, in favor of Citizens Nat'l Bank, Monticello, Ky., for the period beginning the 15th day of March, 1905, and ending on the 15th day of March, 1906, subject to all the covenants and conditions of said original bond heretofore issued on the 15th day of March, 1904.

"Witness the signature of the President and Ass't Secretary this 1st day of February, 1905."

Each of the certificates refer to the fact that they continue bond No. 292114, the number of the bond executed March 15, 1904, clearly showing that one obligation existed for all these years. The bond was kept alive in a manner similar to an insurance policy, that is, by the payment of annual premiums. (First National Bank v. Fidelity, &c., Co., 100 A. St. Rep., 765, and Fidelity Deposit Co. v. Champion Ice Mfg. & Cold Storage Co., 133 Ky., 74.)

Appellant makes no complaint of any wrongful act upon the part of appellee in obtaining the insurance under this bond. It does not contend that any misstatements or concealments were made in the application for the bond and upon which the bond was issued, except in one instance, and that was in answer to the following question:

"To whom and how frequently will he account for his handlings of. funds and securities?

The answer to this question was:

"Twice a year by U. S. Bank Examiner and board of directors four times year."

It is not claimed that the United States Bank Examiner did not examine the cashier's accounts as stated in the answer, nor is it claimed that the bank officials did not make examinations as many as four times a year or oftener, but it does claim that the examinations were not thorough and that it was deceived thereby and for that reason should be released from all liability, as it had a right to expect from such answer that such examinations would be thorough. At the time appellant issued this insurance, it knew that the bank was what is called "a county bank" and that the officers of it were men who, probably, could not give the accounts an expert examination, and it is presumed that it understood the answer to the question to mean that they would give the accounts the best examination they could. In addition, such statement was a mere promissory representation or an announcement of an unexecuted intention,

and exact compliance therewith was not expected. It was not like misrepresenting a past fact within the knowledge of the bank. If the answer had stated that the accounts of the cashier had been examined by an expert accountant on a recent date, this would have been material.

Appellant also contends that it is released from liability on the bond on account of misrepresentations made by the president of the bank in his application for the continuation certificates. All these applications are, in substance, the same, therefore, we will copy but one of them. It is as follows:

"To the United States Fidelity and Guaranty Company.

"This is to certify that the books and accounts of Charles McConnaghy were examined by us from time to time in the regular course of business, and we found them correct in every respect. All monies or property in his control or custody, being accounted for, with proper security and funds on hands to balance his account, and he is not now in default. He has performed his duty in a capable and satisfactory manner, and no change has occurred in the terms or conditions of his employment as specified by us, when the bond was executed."

As previously stated, this bank was examined several times each year by a United States Bank Examiner, and the president and directors made several examinations. The president and directors were not expert accountants, however, and they testified that no discrepancies were found. This question was submitted to the jury under proper instructions and it was settled in favor of appellee.

The instructions were in accord with those given in the case of Fidelity & Guaranty Co. v. Western Bank, 29 Ky. L. R., 639.

There is no pretense that the bank officials had any knowledge of or suspicioned that McConnaghy had committed embezzlement or done any wrong before the applications were made for the bond or the continuance certificates, but the claim is that if appellee had exercised ordinary care it could have ascertained the same before the statements were made. This question was also submitted to the jury upon proper instructions.

The cashier, McConnaghy, about the last of 1906 to the date of his detection, was in the habit of overdrawing his account in the bank, and appellant claims that

it was entitled to notice of this fact. It appears that McConnaghy was a man apparently of considerable wealth for that section of the country; that he was engaged in other business besides cashier of the bank, which required the use of considerable money and from which he also received considerable money. He stood high in the community and was a man of good business ability. The overdrafts were in no way concealed. The bank examiner and officers knew of them. The examiner made a report to the Comptroller of the United States Treasury showing the overdrafts. The officers of the bank did not consider that there was anything wrong in connection with the overdrafts, but they did admonish McConnaghy several times to settle them, which he did, and he repeatedly settled his overdrafts between the dates, but it was detected on October 31, 1908, that he settled them or most of them by forging notes on solvent persons, making it appear that the bank had loaned these persons money and upon the date he issued these notes, he would place a credit to his account. It does not appear that he ever obtained or attempted to obtain any money from any of these persons. It is not claimed by the bank that the overdrafts themselves constituted the crime of embezzlement or larceny, against which appellant had indemnified it, but do claim that the manner in which McConnaghy manipulated and concealed the matter did amount to one or the other or both of said crimes as was detected on October 31, 1908. Therefore, the guaranty company claims that it should have had notice of the overdrafts at the time they occurred. It was the duty of the bank officials to give notice to appellant of any acts of McConnaghy that indicated fraud or dishonesty on his part that were likely to involve a loss upon it, and as McConnaghy concealed his fraudulent acts by forging notes and crediting his overdrafts by the apparent proceeds of the notes, it is now made clear that McConnaghy had an evil intent when he drew the overdrafts and the question is: Did the officials of the bank suspect or have reasons to suspect, that such an intent existed in McConnaghy's mind at the time of the overdrafts? Did the officials of the bank exercise reasonable acre, considering the circumstances, to ascertain his wrongful intent? These questions were properly submitted to the jury under instruc-

tions as favorable to appellant as authorized by the law. (Fidelity & Guaranty Co. v. Western Bank, supra.)

It appears from the record that McConnaghy stole $1,000 in cash from the bank after the bank officials knew he was a defaulter, but the instructions given by the court did not allow the jury to consider that item. The instructions only allowed a recovery for embezzlement or larceny of the bank's money between March 15, 1904, and October 31, 1908, inclusive, the period covered by the contract, and confined the jury to the amount named in the bond, $15,000. The bank's loss between these dates was much more than that sum.

It appears that appellant had a reasonably fair trial, and the judgment is affirmed.