## United States Fidelity and Guaranty Company v. Foster Deposit Bank.

(Decided June 7, 1912.)

### Appeal from Bracken Circuit Court.

1. Fidelity Insurance—Kentucky Statutes—Sec. 639—Promissory Representations—Substantial Compliance Therewith—Ordinary Care.—Where as an inducement to the execution of a bond indemnifying a bank against embezzlement by its cashier, the bank agrees to have the cashier account for his handling of the funds, and to examine the books of the bank, such undertakings under section 639, Kentucky Statutes, are not warranties, but mere promissory representations, and the bank will be entitled to recover unless it failed to substantially comply with its promises, or fail to use ordinary care in examining the books of the bank, and ordinary care in such a case is such care as ordinarily prudent directors of a bank similarly situated would use under like or similar circumstances.

2. Bonds—Action on—Burden of Proof.—In an action by a bank on a bond indemnifying it against loss by reason of the embezzlement of its cashier, a failure of the bank to substantially comply with its promise to examine the books of the bank at stated periods, and to use ordinary care in making such examinations, is a matter of defense, and the burden of proof is on the defendant.

WORTHINGTON & COCHRAN and H. P. WILLIS for appellant.

THOS. D. SLATTERY, W. H. REESE and GEORGE B. KEN-NEY for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

Appellee, Foster Deposit Bank, was located in the town of Foster, Bracken County, Kentucky. Foster has a population of about 200. The authorized capital of the bank was $15,000. Its actual capital was $11,200. Daniel C. McMath was its cashier. On January 11, 1905, he and the bank made a written application to appellant, United States Fidelity and Guaranty Company, to become his surety. On January 20, 1905, appellant executed to the bank a bond, by which it agreed to reimburse the bank for any pecuniary loss it might sustain by reason of the fraud or dishonesty of McMath, amounting to embezzlement or larceny. The liability of appellant, however, was limited to $10,000. Upon the expiration of

the bond, a renewal certificate was issued, continuing the bond in force from January 28, 1906, to January 28, 1907, and on January 28, 1907, a second renewal certificate was issued, continuing the bond in force to January 28, 1908. McMath embezzled about $16,000 of the bank's funds, which were on deposit in its corresponding banks at Cincinnati and Louisville. Upon receiving information of this fact from McMath himself on November 7, 1907, the bank was closed, and upon application therefor, a receiver was appointed to take charge of the affairs of the bank.

Appellant having declined to settle, the bank and its receiver brought this action to recover the sum of $10,-000, with interest. A trial before a jury resulted in a verdict and judgment in favor of the bank for $10,000, with interest from February 11, 1908, until paid, and costs. From that judgment this appeal is prosecuted.

As the amount of the defalcation is admitted, that question is eliminated from the case. Before issuing the original bond, appellant submitted a series of questons to the bank, which questions, together with the answers thereto, are set forth in the application for the bond, under the heading "Employer's Statement," and are as follows:

"Q. To whom, and how frequently, will he (McMath) account for his handling of funds and credits?

"A. Directors of the bank. Once every month.

"Q. What means will you use to ascertain whether his accounts are correct?

"A. By careful examination of books.

"Q. How frequently will they be examined?

"A. Monthly.

"Q. By whom will they be examined?

"A. Three or more directors."

Appellant pleaded that it was agreed between it and the bank that the foregoing representations and promises were expressly warranted to be true, and that it was thereby induced to execute the bond. It further pleaded that the bank utterly failed to carry out any of such promises or warranties; that it did not, by three or more of its directors, or any of its directors, make any careful examination of the books of the bank at any time prior to the defalcations of McMath, and that McMath, the principal in the bond, did not make any account to the bank whatsoever for his handling of the bank's

funds, prior to the bringing of the action. By another paragraph; appellant pleaded that McMath's shortage was due to the gross negligence of the bank in examining his accounts, and in handling the affairs of the bank.

The evidence shows that McMath was not only the cashier of the bank, but its book-keeper also. The money which he embezzled from the bank he lost in speculation. His first peculation took place in June, 1906, and appears on the books in the following way:

On June 20, 1906, he made an entry on his loan register in these words:

"Notes and bills discounted, No. 254, Geo. Eustis & Co., $2,875."

On the other side of the accounts, in order to make it balance, he made two entries showing that he had drawn a draft, No. 697, on the Fifth National Bank of Cincinnati, Ohio, for $1,975, and other draft, No. 907, on the Louisville Banking Company for $900, the two added together making the amount of the pretended loan to Eustis & Co. These two banks were the Cincinnati and Louisville correspondents of appellee, Foster Deposit Bank. The real transaction was that he sent the two drafts to Geo. Eustis & Co., to be used as margins for buying stock. The entry showing any note or bill of Eustis & Co. was false.

The entries made to hide the next defalcation, on July 25, 1906, show a loan made on collateral to Dominick & Dominick of $2,000. This is offset by entries on the other side of the books showing a draft, No. 788, drawn on the Fifth National Bank of Cincinnati, Ohio, for $2,000, payable to Dominick & Dominick. The actual transaction was that this draft was drawn by McMath and sent to Dominick & Dominick to be used as margins. There was no loan and no draft and no collateral given the bank by Dominick & Dominick.

The entries, dated August 4, 1906, to cover up Mc-Math's third peculation, show a loan to Dominick & Dominick of $3,000. The other side of the books show a draft, No. 933, on the Louisville Banking Company for that sum. The withdrawal of the money by the draft was real. The loan of the money to the payees of the draft was false.

The foregoing peculations occurred in the year 1906.

The first false set of entries in 1907 show a loan made to Breed & Harrison of $4,000, on collateral,

which is offset by an entry on the other side of the book, crediting the account of the Fifth National Bank of Cincinnati, Ohio, with $4,000.

On April 7, 1906, and prior to the above peculation, appellee had had a legitimate transaction with Breed & Harrison, whereby a call loan for $4,000 was made to them through the same bank at Cincinnati. This note was renewed and finally paid on January 17, 1907. The false entries in conection with Breed & Harrison were made on March 7, 1907.

There also appears upon the books in the year 1907 the following entry, made by McMath:

"November 9, 1907, $4,342.50.

"Charged notes and bills, $4,342.50.

"Credit Fifth National Bank, Cincinnati, Ohio, $4,342.50.

"McM. acct."

The above item of shortage of $4,342.50, seems to be an accumulation of shortage extending over an uncertain period, and is very difficult of explanation.

The evidence shows that a committee of the directors, consisting of the president, John T. Jett, Mr. Barnard and Mr. McCarty, frequently examined the bank. McMath would bring the books in—sometimes three or four—and spread them out on the table. They would question McMath as to the books and various loans, and in this way the examination was made. The only one who knew anything about book-keeping to amount to anything was Mr. McCarty. In addition to this, the president was in the bank on an average of once a week, and examined the books and discussed the bank's affairs. Taking into consideration the regular and called meetings, their examination of the books would almost average one examination a month. It seems that in the case of loans made by the corresponding banks, the cashier, instead of placing the correspondent's letter of advice in the wallet containing the notes, would simply make use of a memorandum, and this memorandum he would exhibit to the directors. The directors would go over the notes and count the cash. In the month of December, 1906, a more complete examination of the books was made. On that occasion Mr. McCarty testifies that they counted up all the notes, cash and advices or memoranda, or whatever they might have with

the notes, and also counted the cash. The same sort of an examination was made in December, 1905, Mc-Math testifies that the directors on these occasions examined his books, notes, credits and cash on hand, but did not call for any letters of advice in regard to demand loans held by corresponding banks. In these cases, they simply examined the memorandum of such a note.

The evidence further shows that the wallet containing the notes representing the loans made by the bank itself would disclose whether or not any note representing a particular loan was in existence. There is also evidence to the effect that when a demand or call loan is made by a correspondent bank, it forwards immediately a letter of advice, stating that such a loan has been made, and that this should be placed also in the wallet for the purpose of showing the existence of such a loan. Such a letter of advice, however, is not conclusive of the existence of the loan, for it may, as a matter of fact, have been paid off at the time of the examination, or the letter of advice may be forged.

For appellant it is insisted that because the bond provided that appellee made certain representations and promises relative to the duties and accounts of McMath, and that such representations and promises were expressly warranted to be true, and appellant pleaded that it was induced by such representations and promises to execute the bond, the failure of the directors to make the examinations exactly in accordance with their agreement, and their failure to see that every local loan was represented by a note in the wallet, and that every demand or call loan made by one of its correspondents was represented by a letter of advice, was a failure on the part of the bank to comply with its undertakings, and appellant was, therefore, entitled to a peremptory instruction. In support of this position, the cases of Hunt v. Fidelity Co., 99 Fed., 242, and U. S. Fidelity & Guaranty Co. v. Downey, 120 Am. St. Rep., 128, are cited. In those cases, however, the courts held that the representations were warranties, and the insured were held to a strict compliance. Such is not the rule, however, in this State. Section 639, Kentucky Statutes, provides that "the statements or descriptions in an applicaion for a policy of insurance shall be deemed representations and not warranties; nor shall any misrepresentations, unless material of fraudulent, prevent a

recovery of the policy." This section has been held to apply to fidelity insurance, and it has also been held that representations of the kind in question are mere promissory representations and not warranties. Champion Ice Mfg. & Cold Storage Co. v. American Bonding & Trust Co., 115 Ky., 863.

The difference between warranties and representations is that the former must be strictly complied with, while in the case of the latter a substantial compliance is all that is required, and whether or not there has been a subsantial compliance is a question for the jury. May on Insurance, Vol. 1, Secs. 184 and 186; First National Bank v. Fidelity & Guaranty Co., 110 Tenn. 10, 75 S. W., 1076, 100 Am. Rep., 765.

In instruction No. 1, the court set out the questions and answers hereinbefore referred to, and told the jury that if they believed from all the evidence that the representations and promises contained in the answers made by plaintiff bank were made in good faith, and that said bank, through its directors, attemped in good faith to fulfill such representations and promises, and did in fact substantially comply with same, then the jury should find for the plaintiff; but unless the jury so believed, they should find for the defendant. By Instruction No. 2, the jury were told that if they believed from the evidence that the directors of the bank were guilty of gross negligence in the matter of compliance with the representations and promises of the bank contained in the answers set out in Instruction No. 1, then they should find for the defendant. The court also defined gross negligence as a failure to use slight care.

It will be seen from these instructions that plaintiff's right of recovery was based on whether or not it made the representations in good faith, and attempted in good faith to carry them out, and, in fact, substantially complied with them. It is only in cases where representations are made as to a past fact, or when there is evidence of fraud on the part of the insured in making a promissory representation, that the question of good faith is material. In this case, however, the representations were not made as to a past fact, and there is no evidence of any fraud on the part of the bank in agreeing to have McMath account for his handling of the funds, and to have an examination of his books made by the directors. That being true, the submission of the question of good faith served only

to confuse the jury. In addition to this, Instruction No. 2 authorized a verdict for the defendant only in the event that the directors were guilty of gross negligence in complying with the representations made by the bank. Such is not the law. On the contrary, where the representations are material, as in this case, a failure to substantially comply with them, or a failure to use ordinary care in complying with them, would authorize a verdict for the defendant. It will not do to say that the insured under such circumstances complies with its undertaking by simply requiring any kind of an accounting by its cashier, or making any kind of an examination. It must not only require the accounting and make the examination substantially as agreed, but must use ordinary care in doing so. In view of the fact, however, that directors in country banks are not generally experienced in book-keeping and the best methods for examining books, they should not be held to the same degree of care as directors of city banks, who are more experienced in such matters. Therefore, they should be held to that degree of care that ordinarily prudent directors of a bank similarly situated would exercise under like or similar circumstances. U. S. Fidelity and Guaranty Co. v. Citizens National Bank of Monticello, Ky., 147 Ky., 285.

Inasmuch, however, as the failure of the bank to comply with its representations, or to exercise ordinary care in doing so, is a matter of defense, the burden as to these questions rests upon appellant.

On another trial, the court will set out the questions and answers hereinbefore referred to, and will tell the jury to find for the plaintiff, unless they believe from the evidence that plaintiff failed to comply substantially with said representations or promises, or failed to use ordinary care in examining the books of the bank, in which event they will find for the defendant. The court will also define ordinary care as that degree of care which an ordinarily prudent director of a bank similarly situated would exercise under like or similar circumstances. No other instructions will be given.

Judgment reversed, and cause remanded for new trial consistent with this opinion.