## Bank of Hardinsburg and Trust Company, Assignee, et al. v. American Bonding Company of Baltimore, Maryland.

(Decided May 6, 1913.)

### Appeal from Breckenridge Circuit Court.

1. Indemnity—Trial—Question For Jury.—In an action on a bond guaranteeing the fidelity of an employe, the uncontradicted evidence showing that the indemnitor was induced to execute the bond through the fraudulent misrepresentations of the indemnitee, the trial court should have given a peremptory for the indemnitor.

2. Indemnity—Duty of Indemnitor—Fraud.—An indemnitee, who, as an inducement to guarantee the fidelity of his employe, makes representations to the indemnitor, must make a fair exposition of the facts as they are known, or by the exercise of ordinary care, may be discovered by him; if he recklessly makes representations, without regard to their truth or falsity, he perpetrates a fraud upon the indemnitor, as much so as if he had known them to be false.

3. Indemnity—Action—Defenses—Fraud.—In an action on a bond guaranteeing the fidelity of an employe, representations, on the truth of which the bond was executed, made by the indemnitee, in good faith but recklessly and without ordinary care to know their truth, absolves the indemnitor from all liability on the bond.

CLAUDE MERCER for appellant.

C. M. FINN and R. A. MILLER for appellee.

Opinion of the Court by Judge Lassing—Affirming.

Some time in 1903 the Two States Bank was organized and John S. Adair chosen cashier. He held this position continuously until March 7, 1911, when he fled the country. It developed, upon examination, that he was a defaulter and had practically looted the bank. So involved were its affairs and so depleted were its assets that it at once made an assignment to the Bank of Hardinsburg and Trust Company.

On January 10, 1906, the said cashier made application to the American Bonding Company of Baltimore, Maryland, to become his surety to said bank, on a bond for $5,000 required of him by the bank for the faithful discharge of his duties as cashier. Thereupon the Bonding Company addressed a letter to the bank, in which certain questions were asked, and blank spaces were provided in

the letter for the answers to these questions. Upon receipt of this communication by the bank's officers, each question therein asked was answered by R. A. Shellman, the President of the Two States Bank, and the communication returned to the Bonding Company. The said communication containing the questions and answers, is as follows:

"Baltimore, Jan. 10, 1906.

"To the President of
   "Two States Bank,
      "Stephensport, Ky.

"An application has been made to this company to issue a bond of security for Mr. John S. Adair, as cashier in your service, to the amount of $5,000.

"The company desires to have answers to the following questions, and these answers will be taken as the basis of the bond, if issued.

"Very respectfully yours,
      "JAS. BOND,
         "President."

1. (a) Question. To whom is the bond to be made payable?

(a) Answer. The two States Bank.
Give exact title.

(b) Q. State capital and resources of bank.

(b) A. Capital, $15,000; on Deposit, $46,258.08; Surplus, $402.18; Loans, $53,369.89; Undivided Profits, $2,045.69.

(c) Q. Give date of bank's charter or organization.

(c) State or National. A. State, Date Jan. 1903.

2. (a) Q. From what date is the bond to be written, and for what amount?

(a) A. Jan. 15, 1906. $5,000.

(b) Q. What further security, if any, will be required from applicant?

(b) A. None.

(c) Q. Who will pay the premium for the bond required?

(c) A. Two States Banks.

3. (a) Q. How long have you known the applicant?

(a) A. Three years.

(b) Q. How long has he been in the bank's service?

(b) A. Three years.

. (c)  Q.  Has he hitherto furnished security to the bank?

(c)  A.  Yes.

(d)  Q.  If so, who furnished it?

(d)  A.  Your company.

(e)  Q.  If not, why is this bond now required?

(e)  .................................

4.  (a)  Q.  Has the applicant uniformly given satisfaction in his personal conduct and habits?

(a)  A.  Yes.

(b)  Q.  Has he kept his accounts correctly and made proper settlement of all the cash and securities entrusted to his care?

(b)  A.  Yes.

(c)  Q.  Have you any knowledge, or any information, or are you aware of any habit of the applicant, or any circumstances unfavorably affecting the risk to the surety on the bond applied for?  If so, state particulars.

(c)  A.  None.

5.  Q.  Is he now or has he been from any cause indebted to the bank or its officers?  If so, give particulars, stating amount, how incurred and how payment is secured.

A.  None.

6.  (a)  Q.  Is he now, or about to be, engaged or interested in any other business or employment than in the bank's service?

(a)  A.  No.

(b)  Q.  If so, does the bank approve such division of interest or occupation?

(b)  A.  No.

7.  (a)  Q.  What will be the title of applicant's position?

(a)  A.  Cashier.

(b)  Q.  Explain fully his duties in connection therewith.

(b)  A.  Cashier.

8.  (a)  Q.  What salary will he receive?

(a)  A.  $700.

9.  (a)  Q.  In case of the applicant acting as Teller, will he be required to balance his cash daily, and report same to his superior officer?

(b)  Q.  Will a record of such report be kept?

(b)  A.  Yes.

10.  (a)  Q.  Will the applicant have access to the treasury of the bank?

(*a*)  A.  Yes.

(*b*)  Q.  If so, under what restrictions.

(*b*)  A.  None.

11.  Q.  In case of applicant handling cash or securities, how often will same be examined and compared with the books, accounts and vouchers, and by whom?

A.  Quarterly.

12.  (*a*)  Q.  At what date and by whom were the applicant's books and accounts (including cash, securities and vouchers, if any) last inspected and examined?

(*a*)  A.  Jan. 1, 1906, by directors.

(*b*)  Q.  Were they at that time in every respect correct, and proper securities and funds on hand to balance?

(*b*)  A.  Yes.

13.  (*a*)  Q.  Are the pass books of your depositors periodically balanced?

(*a*)  A.  Yes.

(*b*)  Q.  How often?

(*b*)  A.  Monthly.

(*c*)  Q.  By what employee of the bank?

(*c*)  A.  Cashier.

14.  (*a*)  Q.  Does the bank require its book-keepers to change ledgers?

(*a*)  A.  No.

(*b*)  Q.  If so, at what period?

15.  (a)  Q.  At what date was the bank last examined in person by a National or State official?

(a)  A.  Not at all.

(b)  Q.  Was the result of such examination, so far as known to the bank's officers and directors, entirely satisfactory to that official?

16.  (*a*)  Q.  How many officers and employes are engaged in the active service of the bank?

Q.  Cashier and Assistant Cashier.

"It is agreed that the above answers are to be taken as conditions precedent and as the basis of the said bond applied for, and of any renewal or continuance or substitution of or for the same that may be issued by the American Bonding Company of Baltimore to the undersigned, upon the person above named.

"Dated at Stephensport, Ky., this 12th day of Jan., 1906.

> "The two States Bank,
> "by R. A. Shellman,
> "President—Official Capacity.

"This form must be returned to the Home Office, Baltimore, Md., before bond will be issued.".

Thereafter the Bonding Company became the surety for said Adair to said bank for one year, in the sum of $5,000. At the expiration of that year and before the bond was renewed, the Bonding Company made written inquiry of the bank as to how the cashier was discharging his trust, and, upon receipt of a favorable answer, renewed the bond. The following is a copy of the communication upon which the renewal was based:

"To the American Bonding Company of Baltimore:

"This is to certify that, since the issue of the above bond, Mr. John S. Adair, hereinafter called Employe, has faithfully, honestly and punctually accounted for all money and property in said employe's control or custody as my or our employe, has always had proper funds and securities on hand and is not now in default as such employe."

"The Two States Bank, Employer.
"by R. A. Shellman, Pres. Title.
"Dated at Stephensport, Ky., December 31, 1906."

In this way the bond was renewed every year up to, and including, the year beginning January 1, 1911.

In April, 1911, the assignee filed suit against the Bonding Company on the bond for $5,000, dated January 15, 1906, for loss alleged to have been sustained by the Two States Bank during the year ending January 15, 1907, by reason of the default of its said cashier. In an amended petition, the specific amounts alleged to have been wrongfully converted to his own use by said cashier are set out. The answer, in addition to traversing the material allegations of the petition, pleaded that, in the employer's statement which it demanded of the bank before it became surety for said cashier, and in subsequent statements made by the president of the bank to procure renewals of the bond, false and fraudulent answers had been made to the questions propounded, and, as these answers were made the basis of the bond, the company was, because of their falsity, which was known to the bank and unknown to it, absolved from all liability on the bond. The answer further pleaded affirmatively that, at the date of the application for the execution of the bond in 1906, the cashier was a defaulter and short in his accounts with the bank; and that this condition existed when each renewal of said bond was applied for and made; that this fact was known to the bank and its officials and unknown

to it; and that, by reason thereof, it was absolved from all liability on the bond. In the reply, the plaintiff traversed the material affirmative allegations of the answer, and, in addition, denied that the answers to the questions propounded to its president, before the original bond was issued and before each renewal was made, were conditions precedent or warranties; and alleged that all answers made by the president were made by him, in good faith and were believed by him to be true; that the bank's directors and president examined the cashier's accounts to the best of their ability, before making said answers; and that, from such examination, believed the answers so made to the Bonding Company to be true; that they made these examinations, counted the cash, notes and securities monthly, and, so far as they knew, or were able to ascertain, found them to be correct; that they had implicit confidence in the cashier, and had no occasion to believe that he had falsified his records or was short in his accounts, until such condition of affairs was disclosed by an examination of his books after his flight. The rejoinder traversed the affirmative matter set out in the reply, thus completing the issue. The case was tried out before a jury, with the result that a verdict was returned in favor of the defendant, Bonding Company. The plaintiff appeals and seeks a reversal upon the ground that the court erred, to its prejudice, in instructing the jury.

The evidence abundantly shows that the said cashier, during the period covered by this bond and its several renewals, appropriated to his own use the funds of the bank largely in excess of the indemnity provided in the bond. It is conceded by counsel for appellant that, at the date of the execution of the bond sued on, and at all times covered by the bond and its renewals, the cashier was a defaulter and had been indebted to the bank, on account of overdrafts, moneys collected and received by him and applied to his own use, and also on account of moneys received through forged endorsements upon notes, the proceeds of which were used by him. The evidence indisputably shows this fact.

The evidence further shows that, on January 1, 1906, the books and accounts of the said cashier were not examined; that, although the board of directors met at that time, they simply compared a statement, which the cashier had prepared, with the books of the bank. The extent of this comparison was to see that the totals, as they appeared upon the books, corresponded with the totals as

submitted by the cashier in his statement. They did not count the cash. They did not examine the notes and other evidences of debt held by the bank. They made no effort to ascertain whether or not the amount of cash, which the cashier reported as being on hand, was, in fact, on hand. They did not advise themselves as to what negotiable or commercial paper the bank was then carrying, or the amount thereof. They made no attempt to ascertain whether or not the deposits of the individual depositors totaled what the cashier reported the deposits on that date amounted to. In short, they simply accepted the bald statement of the cashier as to what the true condition of the bank was on that date.

The record further shows that, prior to that time, the cashier had been overdrawing his accounts, in sums varying from $65, the lowest, to more than $2,800, the highest amount which he was overdrawn at any one time. Evidences of these overdrafts were to be found in the ledger, in which his individual account as a depositor was kept. When his book was balanced, at the end of each month, it showed that his account had been overdrawn, and contained a statement to this effect, and not only showed the amount thereof, but the fact that it was an overdraft, evidencing an indebtedness to the bank on his part, was manifest by the use of red ink in writing the word "overdraft." One of the rules, or by-laws, of the bank provided: "All applications for loans of $500, or over that amount, shall be submitted to the board of directors, and shall have the approval of a majority of the directors before being made." The purpose of this by-law, which was a most wholesome one, was to prevent the cashier from extending credit, in a large amount, to any customer or person desiring to borrow money from the bank. It appears in evidence that several notes, for a much larger sum than that authorized, were negotiated by the cashier without the knowledge, consent or approval of any of the directors. These were the notes, upon which the names of the pretended makers and endorsers were forged by him. These notes were in the note case, among the papers, and treated as assets of the bank. An inspection of the notes in the note case by the board of directors would have, at once, apprized them of the fact that these loans had been made, contrary to the by-law above quoted, and would have put the directors upon notice and inquiry. But, as stated, they made no investigation along this line, but relied, as they all say they

did, upon the honesty and correctness of the cashier's report, which he made to them. The president of the bank, when he made the original application and the several statements, upon which the various renewals of the bond were had, said that the cashier was not then, and had not been, indebted to the bank in any manner, and that he had kept his accounts correctly and made proper settlement of all cash and securities entrusted to his care, and that knowledge of these facts came to him by reason of an examination of his books and accounts, including cash, securities and vouchers, had on January 1, 1906. The books of the bank show that, at the time these statements were made, the cashier was indebted to the bank, had been violating the by-laws adopted for the government and regulation of the bank, and was, at the time, a defaulter, by reason of his abstracting funds, through the agency of forged paper passed by him through the bank. Knowledge of most of these facts could have been obtained by the president and directors had they made any character of examination whatever. A simple inspection of the books of the bank would have advised them that the cashier had been grossly abusing his position of trust, using the bank's funds to further his own personal financial ventures, and that his account had been, during most of the time of his incumbency, largely overdrawn. Had such an inspection been made, the president of the bank would have known that the cashier had been indebted to the bank and his dealings with it had not been satisfactory and correct, and he would not have answered the questions in the way and manner in which he did. A simple inspection of the notes and commercial paper, which the bank was carrying, would have advised him that the cashier was violating a rule of the bank and making loans without authority; and, as all of the directors testify that the notes, to which he had forged the names of supposed makers and endorsers, were never presented to them and they knew nothing of their existence, such examination could not have helped but disclosed facts sufficient to put them on inquiry, and ultimately lead to an exposition of the methods which were being pursued by the cashier to the financial ruin of the bank. Of course, when no examination was made and they simply accepted the statement of the cashier that the bank held commercial paper of a certain value and character, they deprived themselves of any means of ascertaining the true condition of the bank's affairs. The

most that can be said is, that the directors, including the president, who made these representations to the Bonding Company as to the cashier's course of dealing and standing with the bank, accepted the statement of the cashier as to its condition and made no examination, with the view of verifying the correctness of that statement; and when the president made the representations which he did to the Bonding Company, upon the faith of which the bond was executed, he was speaking, not from any personal knowledge that he had, but from the statements and representations which the cashier had made to him and the board, for he says distinctly that, at no time, did they count the cash, examine the notes, check up the deposits, or do anything other than compare with the totals on the books the statement made by the cashier, as to the financial condition of the bank. This was no examination at all. It was merely a comparison of two papers, each prepared by the man whose accounts they were supposed to examine. Every material statement made in the report submitted by the president, upon which the original bond was issued, with reference to the fidelity, honesty and correctness of the cashier's dealings with the bank, was absolutely false, and the evidence of such falsity was within easy reach of the president and could have been had, by the exercise of any care whatever by him. So far as these matters were concerned, he was not outlining a future course of action, which the bank would pursue, relative to the investigation and examination of the cashier's accounts. He was speaking of past occurrences and existing facts. The Bonding Company had a right to believe these statements as to the condition in which the books of the bank were found on January 1, 1906, just ten days preceding the date upon which these statements were made, to be true and to rely upon them; and if the president chose to make such representations on the statement of the cashier rather than from his own personal knowledge, and loss results, the burden thereof should fall upon the bank rather than upon the Bonding Company.

We do not deem it necessary to enter upon an extended consideration of the effect which should be given the further statement of the president, in the application for this bond, that the accounts of the cashier would be examined quarterly by the board of directors. True, the evidence abundantly shows that this representation was never carried out, and there was no attempt, on the part

of the bank, to hold quarterly meetings, but, instead, semi-annual meetings were held; and, at such meetings, there was no attempt made to examine the accounts of the cashier, but, as they had done on January 1, 1906, so they continued to do at each subsequent meeting; they simply compared the books of the bank with a statement made out by the cashier, purporting to show the true condition of the bank. In other words, their examination went only to the extent of ascertaining whether or not the figures, which he had put on the paper presented to them, corresponded with the figures given as the totals upon the ledgers of the bank. The ascertainment of this fact established nothing. It neither proved nor disproved anything, further than that the cashier had made no mistake in transcribing certain figures from the books of the bank to the sheet of paper which he presented to them. We are of opinion that the rights of the parties may be determined and the real merits of this case decided upon the statements made by the president of the bank as to the state of the cashier's accounts and dealings therewith, at the time the application for the original bond was made; and we, therefore, will not discuss or consider further the effect which should be given the answers in the applications that the examinations would be made quarterly, when, in fact, meetings were not held quarterly and no examination at all was made.

In Graves v. The Lebanon National Bank, 73 Ky., 23, this court had occasion to pass upon the effect to be given statements made by an employer to one proposing to become surety for the fidelity of an employe, and, in the course of the opinion, said:

"There is no principle of law better settled than that persons proposing to become sureties to a corporation for the good conduct and fidelity of an officer to whose custody its moneys, notes, bills, and other veluables are entrusted have the right to be treated with perfect good faith. If the directors are aware of secret facts materially affecting and increasing the obligation of the sureties, the latter are entitled to have these facts disclosed to them, a proper opportunity being presented.

"White and Tudor, in their note to the case of Rees v. Berrington (2 leading cases in Equity, page 707), state the rule as follows: 'Where, therefore, there is any misrepresentation, or even concealment from the surety, of any material fact which had he been aware of he might not have entered into the contract of suretyship, it

will thereby be rendered invalid, and the surety will be discharged from his liabilities.'

"The cases cited by the commentators fully sustain the principle as stated.

"Mr. Justice Story takes even broader ground: 'Thus, if a party taking a guaranty from a surety conceals from him facts which go to increase his risk, and suffers him to enter into the contract under false impressions as to the real state of facts, such concealment will amount to a fraud, because the party is bound to make the disclosure, and the omission to make it under such circumstances is equivalent to an affirmation that the facts do not exist.  *  *  *

"It may not be true that the directors of the Lebanon bank had actual knowledge of the frauds committed by Mitchell while cashier of Burton, Mitchell & Co., nor of the false entries made by him on the books of the institution under their control in order to conceal those frauds, but it is true that either with or without examination they published reports of the affairs of the banking institution, the natural if not the necessary effect of which was to mislead the public.  That these reports reached the eyes of appellants we cannot doubt.  *  *  *

"A fraud may be perpetrated as well by the assertion of facts that do not exist, ignorantly made by one whom the person acting upon the assertion has the right to suppose has used reasonable diligence to inform himself, as by concealing facts known to exist which in equity and good conscience ought to be made known."

While admitting that the statements made by the president, as to the fidelity of the cashier in keeping his accounts and as to his past indebtedness to the bank, were absolutely false, yet it is insisted by counsel for appellant that this fact, not being known to the president when the statements were made, but he, relying upon the honesty and integrity of the cashier, made them in good faith, therefore, the fact that it was subsequently discovered that they were false cannot have the effect of defeating a recovery in this case.  There would be much force in this position, if it had appeared that the president had made any effort to discover the truth relative to the facts with which he was dealing;  but, when he chose to accept the statements of the cashier rather than make a personal investigation or examination, he took the risk, and, if any one is to lose, certainly it should not be the Bonding Company, which had a perfect right to, and did,

rely upon the truth of the statements made by him to the effect that the accounts of the cashier had been examined, only ten days previous thereto, and found to be correct. This is not a new question. This identical question was before us in Warren Deposit Bank v. Fidelity & Deposit Co., 25 Rep., 289. There, representations were made relative to an employe which were, in many respects, similar to those under consideration. It was later discovered that the answers to the questions were false, and that any inspection of the books of the bank, at the time the statements were made, would have disclosed their falsity. In disposing of the question, the court said:

"Appellant contends that the provisions of section 639 of Ky. Stats., are as follows: 'All statements or descriptions in any application for a policy of insurance shall be deemed and held representations and not warranties; nor shall any representations, unless fraudulent or material, prevent a recovery on the policy,' should apply, and that the representations contained in the statements made by Smallhouse cannot under that section be treated as warranties.

"Previous to the enactment of this section of the statute, and in those jurisdictions where similar statutory provisions do not exist, such representations were held to be warranties, and, consequently, if untrue to any extent, whether or not material, the policy or contract was invalidated. * * * It is not material though, whether the statute does or does not apply to bonds made for sureties, as the statute, properly construed, in no way affects the result and ultimate effect of a materially false representation. * * *

"That these misrepresentations were material to the risk in this case there can be no manner of doubt; that they were indisputably false is equally clear. Whether they were fraudulent or not is not, therefore, particularly material.

"We are of opinion that the effect of these material representations was to invalidate the bond."

Nor is the position of appellant strengthened by the plea that the president accepted, in utmost good faith, and believed the report, as made by the cashier, to be true. He cannot shelter himself behind the allegation that he believed the cashier had not been indebted to the bank, or that he believed that, on January 1, 1906, an examination of the books and accounts of the cashier had been made, when, in fact, he had made no

effort to ascertain the correctness of his answers to the first and second of these questions, and knew that his answer to the last was absolutely untrue.

A somewhat simliar case was presented in United States Fidelity & Guaranty Co. v. Blakely, Hurst & Co., 25 Rep., 1271. In that case the employer signed the following employer's statement:

"The replies of the applicant herein are, to the best of my knowledge and belief correct. He has been in the service of the undersigned employer since September 1, 1898, filling the position of bookkeeper and cashier, and has continuously filled the position for which this bond is required since that date. He has always, to the best of my knowledge and belief, given satisfaction in his personal conduct and performance of duties, and kept his accounts faithfully and without default. When last examined or audited all accounts of the office were found in every respect correct up to date. * * * He has not been, nor is he at present, so far as I know or believe, in arrears, default or with unsettled balance in this or any previous service. I know nothing concerning his habits or antecedents affecting his title to confidence, and I know of no reason why the guaranty hereby applied for should not be granted."

On the faith of this statement, bond was signed, and later, the employe having defaulted, litigation followed. The trial court told the jury that, "unless the jury should believe from the evidence that one or more of said statements when made were not true, to the best of the knowledge and belief of the plaintiffs, or either of them, the law is for the plaintiff and the jury should so find." The case was appealed to this court, and, in the course of the opinion, reversing the judgment, the court said:

"The law requires of the employer who makes representations material to the risk for the purpose of inducing another to become bound, as a surety of one of his employes to him more than the mere belief on his part of the truth of such representations. His duty under such circumstances requires that before making such representations, that he should use ordinary care to know that they are true."

"Lawson on Contracts, section 238, on this point says: 'Where persons take it upon themselves to make assertions as to which they are ignorant, whether they are true or untrue, they are as responsible as if they had

asserted that which they knew to be untrue. Whether a party representing the fact knew it to be false, or made the assertion without knowing whether it was true or false, is wholly immaterial. For the affirmation of what he does not know or believe to be true is as unjustifiable as the affirmation of what is known to be false, and the same is true where the party is negligent, or ought to have known or remembered the truth, and did not.' ''

Where officers and directors of a bank obligate themselves to make examinations of the cashier's accounts and dealings with the bank, at stated intervals, they must exercise ordinary care to comply with this obligation on their part, by making some character of examination. The opinions of this court in Fidelity & Guaranty Co. v. Western Bank, 29, Rep., 639; U. S. F. & G. Co. v. Foster Deposit Bank, 148 Ky., 776, and Employers Liability Assurance Co. v. Stanley Deposit Bank, 149, Ky., 735, so hold. They must do something that will satisfy the mind that they have made an honest effort to ascertain the true condition of the bank's affairs, at such times. We do not attempt to define the character of examination which should be made, but simply hold that, where the directors are under the duty or obligation to make an examination, they must do something more than accept the statement of the cashier himself as to the bank's condition; and that is all that was done in the case at bar.

When the facts in this case are considered in the light of the opinions of this court from which we have quoted, it is apparent that no recovery should have been allowed, and the trial court might, with propriety, have given a peremptory instruction. The instructions given, while not peremptory, were practically such. Under them, the jury could not well have done otherwise than find for the defendant.

Where persons make representations to others, with the view of having them become surety on bonds guaranteeing the fidelity of their employes, the law imposes upon them the duty of making a fair exposition of the facts, as they are known to them or as they may be able to discover them by the exercise of ordinary care; and when the evidence indisputably shows, as in the case at bar, that the answers to the questions propounded were false and that the employer could, by the exercise of the slightest care, have discovered their falsity, but chose rather to make the statements of the employe, for whose benefit the bond was to be executed, the basis of his an-

swers, than from personal knowledge acquired from investigation, he does so at his peril.   Where one is called upon to answer a question and he does not personally know what the truth is in regard thereto, it is incumbent upon him to advise himself or to state that he does not know; and if he recklessly answers the question, without regard to the truth or falsity of his answer, he perpetrates a fraud upon the one relying upon the truth of the statement made, as much so as though, at the time it was made, he had known it to be false.

The most favorable aspect, in which the conduct of the president can be viewed, is that, when he filled out and signed the answers in the  employer's statement, upon which the original bond was issued, and the answers to the various questions propounded to him at the time the several renewals were granted, he was induced by the cashier to accept his statement relative to these various matters as true; but, in making the  answers which he did, all of which, bearing upon material questions, were false, the president was, in fact, speaking without any personal knowledge whatever concerning the cashier's conduct of affairs of the bank, and without any attempt on his part to ascertain  their condition. Under these circumstances, it was the duty of the trial court to give a peremptory instruction; hence, it becomes unnecessary to consider the correctness of the instructions given.

Perceiving no error in the record to the prejudice of the rights of appellant, the judgment is affirmed.