## Fidelity & Deposit Company, et al. v. Kane, Special Banking Commissioner, et al.

(Decided December 20, 1918.)

### Appeal from Carlisle Circuit Court.

1. **Insurance— Application— Construction.**—Under section 639 Ky. Stats., all statements and descriptions in an application for policy of insurance, must be construed to be representations and not warranties.

2. **Insurance—Guaranty and Indemnity Insurance—Representation in Application.**—A representation in an application to an indemnity company, by a bank to insure the honesty of its cashier, which represented that the directors of the bank would, once in each week, examine the cash and securities and compare them with the books, accounts and vouchers, was a promissory representation, and while strict compliance would not be required, a substantial compliance was necessary, and it was the duty of the directors, to exercise ordinary care in making the examination.

3. **Insurance—Guaranty and Indemnity Insurance.**—Where a promissory representation is made to an indemnity company to induce it to insure the fidelity of a bank cashier, that the directors would, each week, examine the cash and securities and compare them with the books, vouchers and accounts, the degree of care required of the directors in making the examination, is that degree of care, which ordinarily prudent directors, similarly situated, would exercise under similar circumstances.

4. **Insurance—Guaranty and Indemnity Insurance—Representation.**—If in an application for fidelity insurance, the applicant makes a false answer about a matter material to the risk, knowingly, or makes a false answer about a matter material to the risk, through negligence, by reason of not having used due diligence and precaution in ascertaining the truth, in either instance, the representation would be fraudulent, and avoid the bond.

W. A. BERRY and JESS F. NICHOLS for appellant.

JOHN E. KANE for appellee.

OPINION OF THE COURT BY JUDGE HURT—Reversing.

In 1905, the American Bonding Company, became the surety of R. J. Young, in a bond, executed by him to the Peoples Bank, at Bardwell, and by which the Bonding Company insured the bank against any loss, which it might suffer from larceny or embezzlement, at the hands of Young, who was then an employee of the bank, as its cashier, between the first day of July, 1905, and the first day of July, 1906. The bond, however, provided, that it should not lapse, at the end of the year, if it was continued in force by a renewal receipt, executed by the Bonding Company, which would continue it in force during the term of the renewal. The bond was kept in force during each year thereafter, until the first day of July, 1913, by the execution to the bank of a renewal receipt by the Bonding Company, before or at the termination of each year. To induce the Bonding Company to execute the bond, the bank, by its president, executed and delivered a paper, containing certain representations, in regard to the character and fidelity of Young. Among other representations made by the bank, was one, which was contained, in the following question and answer:

"Q. In case of applicant handling cash or securities, how often will the same be examined and compared with the books, accounts and vouchers, and by whom? A. Once each week by the bank directors."

The statement containing the representations, also, contained the following:

"It is agreed, that the above answers are to be taken as conditions precedent and as the basis of the said bond applied for, and of any renewal or continuance or substitution of or for the same, that may be issued by American Bonding Company of Baltimore, to the undersigned, upon the person above named."

The bond provided, that the representations made by the bank, were warranted to be true, and that it was executed upon that condition. Another condition was, that the surety's liability should cease immediately after the discovery by the bank of any default by Young, as to any subsequent act of defalcation, and that a claim on account of a defalcation by him, should be presented to the surety, within six months, and that a suit or proceeding against the surety, should not be brought, after three hundred and sixty-five days should have passed

from the date upon which the surety's responsibility for the further acts of Young ceased.

Previous to the renewal of the bond by the American Bonding Company, each year, and for the purpose of inducing it to renew the bond, the bank executed and delivered to it, a statement in writing, as follows:

"To the American Bonding Company, of Baltimore. This is to certify, that since the issue of the above bond, R. J. Young, hereinafter called employee, has faithfully, honestly and punctually accounted for all money and property in said employee's control or custody, as my, or our employee; has always had proper funds or securities on hand and is not now, in default as such employee."

Between July, 1912, and the first of July, 1913, the appellant, Fidelity & Deposit Company, of Maryland, took over the business and contracts of the American Bonding Company, and as an inducement to the appellant to insure the bank against any losses, by reason of dishonesty of Young, as its cashier, its president executed and delivered to the appellant, the following writing, which accompanied the application of Young:

"EMPLOYERS' CERTIFICATE.

"It is agreed, that the information previously furnished, by the undersigned, to the American Bonding Company, of Baltimore, Maryland, regarding the above named employee, his duties and employment and the supervision exercised over the work and acts of the employee, shall be warranties and shall constitute the basis of and form part of the bond, or any continuation or continuations thereof, that may be issued by the Fidelity & Deposit Company, of Maryland, to the undersigned, in behalf of the employee, whose application appears above.

"As employer, the undersigned, certifies and warrants, that the employee has always faithfully, honestly and punctually accounted for all money and property in his custody or under his control, and has performed his duties in an acceptable and satisfactory manner. We know of nothing in his habits affecting, unfavorably, his title to confidence and we know of no reason why a guarantee bond, in his behalf, should not be issued."

Upon the above representations, together with the premium paid, the appellant became the surety of Young to the bank, in a bond, which insured it against any

pecuniary loss, which it might suffer, from any "dishonest act or acts" committed by Young, in the performance of his duties, as cashier for the bank, between the first day of July, 1913, and the first day of July, 1914, and, also, against any loss suffered from the dishonesty of Young, during the term of the bond and its renewals, which were executed by the American Bonding Company. The bond, among other conditions, provided, that the bank, upon becoming aware of the commission of any act by Young which could be made a basis of a claim under the bond, should immediately give the surety, notice of it, in writing, and within ninety days, make out and present its claim for the loss, and that unless the notice was given immediately, and the claim presented, as above stated, the bond, should be and become void, as to any then existing or future liabilities. It was, also, provided, that there should be no liability on the bond for any dishonest act of Young, committed by him, after the bank should become aware of his having committed an act, which would be a basis for a claim under the bond, and that there should be no liability, for any claim filed with the surety, after six months, from the expiration of the bond.

About the first of May, 1914, the bank became unable to longer continue in business and was closed, and placed in the hands of the Banking Commissioner, for the winding up of its business and the distribution of its assets.

The Special Banking Commissioner, having the matters of the bank, in hand, instituted this suit against the cashier and his surety, the appellant, to recover, for the pecuniary losses sustained by the bank, from dishonest acts of the cashier, during the term of the bond, and that of the bond executed by the American Bonding Company, to the extent of the penalty of the bond, which was $5,000.00. The action was transferred to the equity side of the docket, and prepared and tried as an equitable action, and resulted in a judgment against the obligors, in the bond, to the full amount of the penalty of the bond, and from this judgment, the Fidelity & Deposit Company has appealed.

It is insisted, that the judgment should have been in favor of appellant, because:

(1)   The directors of the bank failed to examine the cash and securities and compare them with the books,

accounts and vouchers once, each week, as the bank represented, that it would do, as an inducement for the execution of the bond.

(2)   To procure the execution of the bonds, the bank, falsely, represented, that the cashier had always, theretofore, faithfully, honestly and punctually accounted for all money and property in his custody or under his control and performed his duties in an acceptable and satisfactory manner, and that it knew nothing in his habits, which would, unfavorably, affect his title to confidence and knew of no reason why a guarantee bond, should not be executed in his behalf.

(3)   That when the officers and directors of the bank became aware of the commission of dishonest acts by Young, which were the subject of a claim under the bond, they failed to give appellant notice of it, and failed to make any claim within ninety days.

(a)   The dishonest acts, upon which the action is based, and upon which the appellee relies as a breach of the bond, which covered the acts of the cashier from July 1, 1913, until July 1, 1914, were overdrafts, which the cashier allowed certain of the bank's depositors to make, and all of which amounted to the sum of several thousand dollars, at the time the bank went into liquidation. The claim, that there was any breach of the bond executed by the American Bonding Company, which was renewed by appellant, seems to have been abandoned. It further, appears, to be conceded, that the overdrafts made by the depositors during the term of the bond executed by the Fidelity & Deposit Company, exceeded the penalty in the bond. Hence, it is only necessary to consider, whether, there was a breach of the latter bond, and if so, whether the appellee is entitled to recover the penalty provided for in it. An overdraft permitted by the cashier of a bank, with the consent or by the direction of the directors of the bank, does not seem to be an act of dishonesty, on the part of the cashier, but, in the instant case, it is contended, that the overdrafts were permitted by the cashier, contrary to the express directions of the officers and directors, and were concealed from them by the cashier. The evidence, shows, without dispute, that one Samms, who seems to have been the chief offender, in that regard, had been a customer of the bank, since the year, 1903, and from that time, until the failure of the bank, his account had been over-

drawn many times, and practically, all of the time. A discount committee, which was composed of certain of the directors, assembled at the bank's office, on nearly every Saturday afternoon, for several years, previous to the failure of the bank and on all of these occasions, they were informed, by the cashier, of a certain number of overdrafts, by depositors, in various sums and amounts. The members of this committee testify, that on these occasions, they would direct the cashier to collect the overdrafts, and not to permit them any more, but, the same condition would exist regularly, at each meeting of the committee, and the cashier continued to be retained, in his position, and no report was ever made to his surety, on account of the overdrafts, nor claim filed for same. The first examination made of the bank, by the examiner for the state, after that office was created, and which was previous to the execution of the bond of July 1, 1913, the examiner found and reported to the president and directors, personally, that the cashier had permitted overdrafts, in favor of various persons, in the sum of about eight thousand dollars. At each of two examinations made by the examiner, thereafter, he found and reported to the president and directors other overdrafts, which the cashier had permitted. The president testifies, that after the report, to him and the directors, of the first examination, made by the the state examiner, that he made an investigation of the books, and hunted out the overdrafts and caused them to be collected. All of these overdrafts were permitted, by the cashier, according to the president and directors, without their consent, and against their express directions. Hence, whatever dishonest act or acts were committed by the cashier, in permitting these overdrafts, they were well known to the president and directors of the bank. After the creation of the office of State Bank Examiner, and to conceal such overdrafts, as might exist, from him, at the time of his visits, the cashier adopted a plan of keeping two ledgers, in which to keep the accounts of the depositors. When the account of a depositor would show a considerable overdraft, the account would be transferred to what is called, in the evidence, the "small ledger," and a new account opened with the depositor in the larger book. Certain accounts against which there was no checking, would also be transferred to small book, so as to make it appear that the bank's condition was solvent. The "small ledger,"

was kept, in the vault of the bank, and the president and directors claim, that they did not know of its existence, though it does not appear, that they ever made any examination of the books of the bank, at any time. A bookkeeper of the bank, who was engaged therein, for several months, during the year, 1913, claims to have found the "small ledger" behind a box in the vault, and thereafter, he made entries upon it, by the direction of the cashier, during the remainder of the time, he was engaged, in the bank, and, hence, must have frequently, had it upon his desk. The president of the bank, was in the bank, nearly every day, and after finding the "small ledger," the bookkeeper called the president's attention to it. The president, thereafter, called in two or more of the directors and asked the cashier to explain to them, the facts in regard to the "small ledger." The cashier explained, that when a leaf in the large ledger had been filled, it was taken out and placed, in the smaller one, and that everything was all right. No examination or attempt to examine its contents, or of the other ledger, at that time was made, and the explanation of the cashier was treated as satisfactory. In November, 1913, the account of Samms, as shown upon the large ledger, was overdrawn over two thousand dollars, when the account was "dropped" and a new one opened with him. About April, 1914, the president's attention was called to certain overdrafts made by Samms, which were over two thousand dollars, and the president made preparations to attempt to collect it by legal process, when Samms voluntarily, paid to the bank, the sum which was proposed to be attached. After the bank was closed, it was found, that the overdrafts made by Samms, amounted to over seven thousand dollars. A judgment was secured against Samms, for the amount and a return upon an execution of *fieri facias* against him, that no property could be found, out of which to satisfy it, or any part of it.

(b) The execution of a bond to indemnify an employer against the dishonesty of his employee, is denominated fidelity insurance, and section 639, Ky. Stats., has been consistently held to apply to an application for such a bond. The purpose of that statute was to prevent an insured, from losing the benefits of his insurance, because of either a representation or warranty, which was not fraudulent or material to the risk. The

statute requires "all statements and descriptions" in any application for a policy of insurance to be held and construed to be representations and not warranties. Any misrepresentations made in the application, will not defeat a recovery upon the policy, unless they are material or fraudulent. The representation made in the application to the American Bonding Company, and which was agreed should be considered, in the application for the bond executed by the Fidelity & Deposit Company, contained the undertaking, that if the cashier handled cash or securities, that the cash and securities would be examined and compared with the books, accounts and vouchers, once, each week, by the directors of the bank. The cashier handled all the cash and securities. This representation is what is termed a promissory representation, and is an assurance to the insurer of the degree of supervision, which the insured will take over the duties intrusted to, the employee, and his opportunities to commit the acts against which the employer is to be indemnified. A failure to strictly comply with a representation does not prevent a recovery upon the bond, a substantial compliance is sufficient. May on Insurance, vol. 1, secs. 184 and 186. To prevent a recovery upon the bond, in the instant case, upon the ground, that the bank had not complied with the promissory representation, above stated, it would be necessary to show, that the directors failed to substantially comply with the promise, or failed to use ordinary care in examining the books, accounts, vouchers, moneys and securities of the bank. The degree of care required by the directors, is that degree of care, which ordinarily prudent directors similarly situated, would use under similar circumstances. U. S. Fidelity & Guaranty Co. v. Citizens National Bank, 147 Ky. 285; U. S. Fidelity & Guaranty Co. v. Foster Deposit Bank, 148 Ky. 782; The Fidelity & Guaranty Co. v. Western Bank, 29 R. 639; Employers' Liability Insurance Co. v. Stanley Deposit Bank, 149 Ky. 735. If the directors failed to substantially comply with the representation to examine the securities, and moneys and compare them with the vouchers, accounts and books, and did not exercise the care required in the examination, no recovery upon the bond should be had. The examinations made, which were not once in each week, as represented, unless the actions of the discount committee, could be held to be substantially

a compliance with the promise by the directors, consisted of an examination of the notes held by the bank. No count of the cash on hand was ever made by any officer or director, either during or before the term of the bond sued on. No examination of the checks given by depositors upon the bank, was ever made nor comparison of them with the accounts, nor any comparison of the money or securities, with the accounts, or checks was ever made. A statement of the condition of the bank, was on the occasions of the meetings of the discount committee, and on meetings of the directors, presented by the cashier, which consisted of a statement of the gross amount of the assets and liabilities of the bank, which was looked at by the directors. This was merely taking the word of the cashier, and did not amount to an examination, nor an attempt at an examination. There is no question of the exercise of ordinary care, in the examinations, when really no attempt at an examination was ever made by the directors. Although the directors were persons not skillful in the keeping of books, this does not excuse them from failing, in good faith, to attempt to make the examinations, and it is difficult to see how such a want of knowledge of bookkeeping could exist, with the directors of a bank, that they could not tell, by weekly examinations, when an account was overdrawn, when the books showed same to exist. The president of the bank shows, by his testimony, that when informed by the examiner, that overdrafts existed, that he was capable of looking into the books and discovering them, as he testifies, that he did so.

(b)   The representation made in the application, to the Fidelity & Deposit Company to execute the bond, which covered the last year of the cashier's services, to the effect, that the cashier had always, theretofore, faithfully, honestly and punctually accounted for all money and property in his custody or under his control, and had performed his duties in an acceptable and satisfactory manner, and that the president of the bank knew of nothing in his habits affecting, unfavorably, his title to confidence, and knew of no reason why a guarantee bond, in his behalf, should not be issued, was a statement relative to present and past facts. When this statement was subscribed and designed to induce the appellant to become the surety of the cashier, and

thereby insure his honesty, the president, who signed it, and all of the directors knew, that the cashier had, repeatedly and continually, permitted the depositors to make overdrafts without their consent and contrary to their express directions. In fact, they had been informed of his habit in this regard, every week, for several years, and at the first examination by the examiner, as before stated, they had been informed, that the cashier had permitted overdrafts in the sum of several thousand dollars, and had found same to be true. Hence, if the act of the cashier, in permitting an overdraft was a dishonest one, as is contended, the conclusion can not be escaped, that the president, when he signed the above statement, to induce the execution of the bond, knew, that the statement was untrue. The best that can be said for him, is, as he says himself, that he signed the representations, without troubling himself to find out what was in them. It is scarcely believable, that the appellant would have executed the bond, if the president and directors had given to it, the information, they then, possessed, to the effect, that the cashier had, theretofore, for years, contrary to their wishes, and directions, permitted, in the language of the president, "Tom, Dick, Harry and the Devil" to make overdrafts upon the bank. The question of good faith does not enter into the consideration of this representation, as the president proves, that he knew the statement to be false. As to a fraudulent representation, in an application for fidelity insurance, if an employer makes a false answer knowingly, about a matter, material to the risk, and the answer is relied upon and induces the execution of the bond, it is fatal to a recovery upon it. If an employer makes a false answer, not knowing whether or not it is true, and without having used due diligence and precaution, to learn the truth, such an answer is fraudulent, and will, likewise, defeat a recovery, when the answer is relied upon by the insurer. American Bonding Company v. Ballard County Bank, 165 Ky. 63; Bank of Hardinsburg & Trust Co. v. American Bonding Co., 153 Ky. 579; U. S. F. & G. Co. v. Foster Deposit Bank, 148 Ky. 776; Graves v. Lebanon National Bank, 73 Ky. 23; U. S. F. & G. Co. v. Blakely, etc., 25 R. 1271.

For the reasons indicated, the judgment is reversed and cause remanded for proceedings not inconsistent with this opinion.